489 A.2d 91

**Aaron WARD**

v.

**FEDERAL KEMPER INSURANCE COMPANY.**

**No. 988, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

March 15, 1985.

352

Joseph F. Zauner, III, Baltimore, (Rochlin & Settleman, P.A., Baltimore, on brief), for appellant.

M. Natalie McSherry, Baltimore, (Whiteford, Taylor, Preston, Trimble & Johnston, Baltimore, on brief), for appellee.

Argued before BISHOP, ADKINS, and ROSALYN B. BELL, JJ.

ADKINS, Judge.

The issue posed to us by appellant, Aaron Ward, is whether appellee, Federal Kemper Insurance Company, properly cancelled an insurance policy for nonpayment of a premium. The question is whether Ward owed the premium at the time of cancellation. The answer to this seemingly-simple question is complicated by a problem in the law of negotiable instruments: in whose hands are the funds represented by a check that the drawer (Federal Kemper) has mailed to the payee (Ward) but that is never paid by the drawee bank because never negotiated by the payee? The facts are undisputed.

On May 19, 1981, Federal Kemper issued an automobile liability policy to Ward and his then wife (hereinafter "Ward"). Ward paid the premium in full. By its terms, the policy was to expire on November 17, 1981. On August 4, because of a change of vehicles owned by Ward, Federal Kemper sent him a check (payable to him) in the amount of $12.00, and drawn on The Citizens National Bank of Decatur, Illinois. This represented a refund of overpaid premium. Ward received the check but never negotiated it.

Soon after sending the check, Federal Kemper discovered that the proper refund should have been $4.50, rather than $12.00. On August 18, it billed Ward for the difference of $7.50. Ward did not recall receiving the bill. In any event Ward never paid the $7.50, and pursuant to provisions of the policy, Federal Kemper mailed Ward a notice of cancellation effective October 11.[1] On November 15 Ward was involved in an accident while driving the insured vehicle. The accident resulted in personal injury and property damage to him, his vehicle, and to the persons and properties of others involved in the accident. Federal Kemper declined to provide coverage.

Ward sued the insurance company in the Circuit Court for Baltimore City, seeking a declaratory judgment as to coverage. There were cross-motions for summary judgment. Because he believed that summary judgment is inappropriate in a declaratory judgment action, the hearing judge treated the proceedings as a hearing on the merits. No one objected. The judge concluded that "at the time the bill was sent ... in the amount of $7.50, that amount was not due Kemper." He thought that "until the negotiable instrument is negotiated and paid by the drawee back [bank] Kemper has suffered no debit." Nevertheless, he went on to opine:

> I ... conclude that Kemper proceeded properly on an assumption that its bill was being ignored in moving for cancellation. As a matter of fact, the negotiable instrument which it had issued to Mr. Ward was still outstanding and perfectly valid on its face for a period of six months by its very terms. It is not required under the statutory provisions dealing with cancellation to wait for

---

1. It is not clear that Ward ever actually received the bill or the cancellation notice. These were mailed to his address as shown on Federal Kemper's records. At some point, however, Ward, because of domestic difficulties, had changed his address. Although the policy required him to notify Federal Kemper of such a change of address, Ward did not notify the insurer.

the expiration of the six month period of the draft before seeking its set off amount due.[2] I conclude from the stipulated facts that cancellation was proper on October 11, 1981. That being so, there was no insurance coverage ... by Kemper ... at the time of the accident on November 15. . . .

He granted judgment in favor of Federal Kemper.

■ In this court Ward contends that unless a premium is actually due and unpaid, an insurer may not cancel a policy for its non-payment, citing Art. 48A, § 234 A(a) to the effect that "[n]o insurer ... shall cancel ... a particular insurance risk ... for any arbitrary, capricious, or unfairly discriminatory reason." Whatever the precise reach of § 234 A(a), *Lumbermen's Mutual Casualty Co. v. Insurance Commissioner,* 302 Md. 248, 487 A.2d 271, 281 (1985), we agree that an insurer may not cancel a policy for nonpayment of premium unless the premium is in fact due. *See Government Employees Co. v. Insurance Commissioner,* 273 Md. 467, 483, 330 A.2d 653 (1975). To put this self-evident point more directly:

> Where the propriety of the cancellation of a policy depends upon the nonpayment of a premium it necessarily follows that there is no effective cancellation when in fact the premium has been paid. For if a premium has been paid, the insurer cannot cancel for nonpayment of such premium [citations omitted].

M. Rhodes, *Couch Cyclopedia of Insurance Law* § 67:74 (Rev.2d Ed.1983).

Federal Kemper does not dispute these propositions. The parties agree that the real issue is who had the $7.50 premium due balance that was included in the unnegotiated $12.00 check. If this money was Ward's by virtue of his possession of the check and his ability to negotiate it, then

---

**2.** Ward submits that there are no Maryland statutory provisions regulating procedure for cancellation of a policy for nonpayment of premium. *See* Code, Art. 48A, §§ 240 A(a) and 240 AA(a). Whether this is correct we need not decide; for purposes of this case we accept the argument.

Ward owed Federal Kemper the $7.50 and the cancellation was proper. If, on the other hand, the $7.50 was still under Federal Kemper's control, because the check had not been negotiated when the policy was cancelled, the cancellation was improper. To resolve this question we must turn to the Uniform Commercial Code rather than to Art. 48A.

Ward points to § 3–409(1) of the Commercial Law Article (§ 3–409(1) of the UCC) which provides that:

> A check or draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it.

Because of this rule, he argues, his mere possession of the $12.00 check did not have the effect of transferring the $12.00 to him. Federal Kemper could have stopped payment or, for that matter, closed its account at the drawee bank prior to presentment of the check. In either of these events, he would have had nothing more than a claim against Federal Kemper for the $4.50 in fact due him; the $7.50 overpayment would at all times have remained under the insurer's control, as it in fact did. He cites *Malloy v. Smith*, 265 Md. 460, 290 A.2d 486 (1972), in which the Court of Appeals, by way of dictum, observed that a personal check cannot be the subject of a gift *causa mortis*. Referring to § 3–409(1) the Court explained:

> The point is, of course, that when the donor uses his own check to make the gift, there is no assignment of funds because he does not relinquish control of the sum which the check represents. A consequence of this is that a valid delivery alone will not complete the gift. To perfect the gift the check must be presented by the donee and accepted by the drawee, because the donor could stop payment, withdraw from his account the very funds which the check represents, or die before payment is made, any one of which would revoke the gift.

265 Md. at 463, 290 A.2d 486.

Federal Kemper counters that by virtue of § 3–413 the drawer of a check "engages that he will pay the instrument

according to its tenor ..." and further "engages that upon dishonor [as through a stop payment order] and any necessary notice of dishonor or protest he will pay the amount of the draft to the holder. . . ." According to Federal Kemper, a stop payment order may be effective to prevent payment of a check by the drawee, but that does not affect the drawer's liability to a holder in due course. Section 3–305.[3] Had Ward negotiated the $12.00 to a holder in due course, thereby receiving value for it, Federal Kemper would have been liable to the holder in due course despite any stop payment order. *First National Bank of Trinity, Texas v. McKay,* 521 S.W.2d 661 (Tex.Civ.App.1975). When Federal Kemper billed Ward for the $7.50 and when it issued the cancellation notice, it had no way of knowing whether a holder in due course had entered the picture. Thus, the argument continues, by issuing the check to Ward, Federal Kemper obligated itself to pay $12.00. And since that obligation was $7.50 more than its actual premium refund debt to Ward, Ward was obligated to pay Federal Kemper the difference. Therefore, Ward owed Federal Kemper a premium of $7.50, a sum that has never been paid.

■ We think Federal Kemper misapprehends the nature of a check and the relationships of the parties to it. A check is a draft or bill of exchange—an order by a drawer (Federal Kemper) to a drawee (Citizens National Bank of Decatur) to pay money to a payee (Ward). Section 3–104. B. Clark, *The Law of Bank Deposits, Collections and Credit Cards* Par. 1.1[1] (Rev.Ed.1981) (hereinafter "Clark"). As between drawer and drawee, the relationship is one of creditor and debtor. The drawer does not "own" the funds it has on deposit with the drawee. Its balance on the drawee's books represents a debt owed the drawer by

---

**3.** This was the rule under pre-code Maryland law. *Dean v. Eastern Shore Trust Co.,* 159 Md. 213, 219, 150 A. 797 (1930). Apparently, the same result would obtain under the U.C.C. *See* § 4–403 comment 8 (1975).

the drawee. The funds are "owned" by the drawee. *Id.* par. 2.1.

When the drawer draws a check on the drawee and delivers the check to the payee, the check ordinarily is regarded as only a conditional payment of the underlying obligation. *Merriman v. Sandeen,* 267 N.W.2d 714, 717 (Minn.1978). H. Bailey, *Brady on Bank Checks* §§ 1.8, 4.5 (5th ed. 1979 & 1984 Cum.Supp.) (hereinafter "Bailey"). *See also Moore v. Travelers Indemnity Ins. Co.,* 408 A.2d 298 (Del.Super.1979).[4] The conditions are that the check be presented and honored. Until those conditions are met, no one is directly liable on the check itself; Clark, par. 1.3. The underlying obligation represented by the check is similarly suspended until those conditions are met; § 3–802(1)(b). If they are not met (if, for example, the check is dishonored) an "action may be maintained either on the [check] or the obligation...." *Id.*

The point is that the drawer is only secondarily liable on the check when he issues it. *Stewart v. Citizens and Southern Natl. Bank,* 138 Ga.App. 209, 225 S.E.2d 761 (1976). Clark, par. 1.3; §§ 3–122(3) and 3–413(2). As Ward correctly asserts, the delivery of Federal Kemper's check did not operate as an assignment to him of any funds in the hands of the drawee; § 3–409(1). Clark, par. 3.1[1]. Ward, when he received the check, acquired no proprietary interest in the fund on deposit. Bailey § 4.1.[5]

---

**4.** This is the case under the Uniform Commercial Code and was also the case under pre-code law. *Haines v. Pearce,* 41 Md. 221, 231–32 (1874); Aigler, *Rights of Holder of Bill of Exchange Against the Drawee,* 38 Harv.L.Rev. 837, 845 (1925).

**5.** In *Hoffman Chevrolet, Inc. v. Washington County National Savings Bank,* 297 Md. 691, 701, 467 A.2d 758 (1983), the Court of Appeals held that a check is "property" for purposes of attachment law. That holding, however, was based on the view that a check is a chose in action—evidence of a potential claim—not on the theory that the holder of the check had any proprietary interest in the fund in the drawee's hands.

■ The $12.00 check involved in this case was, of course, never dishonored. Thus, Federal Kemper never became liable directly on the check, nor was its underlying obligation (to refund $4.50 to Ward) ever actually discharged. The check was never presented to the drawee and, therefore, never paid, so the funds it represented were never transferred to Ward. In point of fact, those funds remained (and so far as we know, still remain) in the Citizens National Bank of Decatur, subject to Federal Kemper's control. Under these circumstances, we do not think that Ward owed any premium to Federal Kemper. *See Owl Electric Co. v. United States Fidelity and Guaranty Co.,* 131 Ill.App.2d 333, 268 N.E.2d 493 (1971). *See also Klein v. Tabatchnik,* 459 F.Supp. 707, 715–16 (S.D.N.Y.1978), *aff'd.* (as to relevant issue) 610 F.2d 1043, 1049 (2d Cir.1979) and *In re Sportsco,* 12 B.R. 34 (Bkr.Ct. for D.Ariz.1981).

■ It is perfectly true that when Federal Kemper billed Ward, and when it sent the cancellation notice, there might have been a holder in due course lurking in the wings. That is a business risk Federal Kemper took when it proceeded as it did. The policies underlying the protections given a holder in due course, Lawrence & Minan, *The Effect of Abrogating the Holder in Due Course Doctrine on the Commercialization of Innovative Consumer Products,* 64 B.U.L.Rev. 325, 327–330 (1984), do not affect the underlying relationships between Ward and Federal Kemper, especially when, as here, there was no holder in due course.[6] When Federal Kemper attempted to cancel the policy the entire premium was in its bank account; Ward owed it nothing at that time.

Accordingly, we hold that the Circuit Court for Baltimore City correctly concluded that "at the date the [premium due] bill was sent in the amount of $7.50 on August 18,

---

6. Had a holder in due course come forward, Kemper might have been able to assert that Ward's conceded failure to keep it apprised of his whereabouts caused it to suffer a loss. Since Ward never negotiated the check, we need not address this issue.

1981, it was not due." That being so, Federal Kemper could not lawfully have cancelled Ward's policy for nonpayment of that premium. Ward is entitled to a declaratory judgment to the effect that his Federal Kemper policy was in full force and effect when the accident occurred. *See Jennings v. Government Employees Ins. Co.*, 302 Md. 352, 488 A.2d 166 (1985).

JUDGMENT REVERSED. CASE REMANDED FOR ENTRY OF DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. APPELLEE TO PAY THE COSTS.